# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 27, 2023        Decided July 23, 2024

No. 22-5249

BRIDGEPORT HOSPITAL, DOING BUSINESS AS YALE NEW
HAVEN HEALTH, ET AL.,
APPELLEES

v.

XAVIER BECERRA, SECRETARY, UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES,
APPELLANT

———

Consolidated with 22-5269

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:20-cv-01574)

———

*David L. Peters*, Attorney, U.S. Department of Justice, argued the cause for appellant/cross-appellee. With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Abby C. Wright*, Attorney, *Samuel R. Bagenstos*, General Counsel, U.S. Department of Health and Human Services, *Janice L. Hoffman*, Associate General

Counsel, and *Susan Maxson Lyons*, Deputy Associate General Counsel.

*Katrina A. Pagonis* argued the cause for appellees/cross-appellants. With her on the briefs was *Kelly A. Carroll*.

Before: RAO and WALKER, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WALKER.

WALKER, *Circuit Judge*: Parts of the United States Code are notoriously short on details. When should the FCC license a radio station? When "public interest, convenience, and necessity" require it. 47 U.S.C. § 309(a). What can FERC allow companies to charge for electricity transmission? Rates that are "just and reasonable." 16 U.S.C. § 824d(a). What primary standards for particle pollution should the EPA set? Standards that are "requisite to protect the public health," while allowing for "an adequate margin of safety." 42 U.S.C. § 7409(b)(1).

But sometimes Congress speaks precisely. And it did so in the section of the Medicare Act at issue in today's case. *See id.* § 1395ww. With remarkable specificity, this statutory section prescribes intricate formulas to reimburse hospitals for inpatient care.

The Department of Health and Human Services does not like the result of those formulas. So it categorically inflated reimbursements for 25 percent of hospitals — at a cost of $245 million more than Congress prescribed. Then, to balance the budget, HHS reduced reimbursements for all other hospitals.

The district court held that HHS cannot deviate in that way from Congress's directive. Without vacating HHS's action, the district court remanded the rule with instructions to recalculate the reimbursements.

Like the district court, we hold that HHS exceeded its authority. Unlike the district court, we conclude that HHS's unlawful action must be vacated.

## I. Background

## A. Medicare's Reimbursement System

Medicare covers the health care of elderly and disabled Americans. Its coverage includes inpatient care. When hospitals provide that care, they receive Medicare reimbursements. *See* 42 U.S.C. § 1395d(a); *see also Becerra v. Empire Health Foundation*, 597 U.S. 424, 428-29 (2022).

The Department of Health and Human Services calculates inpatient reimbursements according to formulas chosen by Congress. *See Empire Health Foundation*, 597 U.S. at 428-29. The formulas include predetermined fixed rates. The rates approximate the amount of money "an efficiently run hospital, in the same region, would expend to treat a patient with the same diagnosis." *See id.* at 429; *see also* 42 U.S.C. § 1395ww(d).

To fully understand how all the Medicare formulas work, you would have to read the tens of thousands of words in 42 U.S.C. § 1395ww. But the basics of the inpatient reimbursement system go something like this. Begin with a fixed rate for *wages* — the first component. *See Cape Cod Hospital v. Sebelius*, 630 F.3d 203, 206 (D.C. Cir. 2011). Then, add a fixed rate for *nonlabor costs* — the second component.

*See id.* Finally, multiply that sum by a fixed rate assigned to each patient's *diagnosis* — the third component. *See id.*; *see also* 42 U.S.C. § 1395ww(d)(2), (4).

Unlike the other components, the wages component depends on the hospital's location. That's because hospitals in different regions pay different wages. *See Southeast Alabama Medical Center v. Sebelius*, 572 F.3d 912, 915 (D.C. Cir. 2009); *Bridgeport Hospital v. Becerra*, 589 F. Supp. 3d 1, 4 (D.D.C. 2022); *see also* 42 U.S.C. § 1395ww(d)(3)(E)(i).

To account for those differences, Congress added the wage-index provision. *See* 42 U.S.C. § 1395ww(d)(3)(E)(i). It instructs HHS to adjust reimbursement rates according to a set wage index. That index compares a region's average wages to the nation's average wages and assigns each hospital a set value reflecting the wage-related expenses of hospitals in its area as compared against the national average. *Id.*; *see also Robert Wood Johnson University Hospital v. Thompson*, 297 F.3d 273, 276 (3d Cir. 2002).

The wage index tags the national "wage index value" at 1.0. *See Bridgeport Hospital*, 589 F. Supp. 3d at 6; *id.* at 5 n.3. A region with higher-than-average wages is assigned a value greater than 1.0 — and a hospital there gets a higher-than-average rate. *See id.* at 5 n.3. Likewise, a low-wage region is assigned a value less than 1.0 — and a hospital there gets a lower-than-average rate. *See id.*

In addition to prescribing all that, Congress passed two other provisions relevant to this case. First, it provided that annual fluctuations in the wage index must be budget neutral. 42 U.S.C. § 1395ww(d)(3)(E)(i); *see also Baystate Franklin Medical Center v. Azar*, 950 F.3d 84, 87 (D.C. Cir. 2020). So anytime HHS increases reimbursements in one region, it must

decrease reimbursements in other regions. *Baystate Franklin Medical Center*, 950 F.3d at 90. Second, in an adjustments provision, Congress said HHS can make "adjustments" to inpatient reimbursements. 42 U.S.C. § 1395ww(d)(5)(I)(i).

## B. The Wage-Index Redistribution Policy

In 2018, HHS decided that wage disparities among hospitals were too great. 84 Fed. Reg. 19,158, 19,394 (May 3, 2019). It reasoned that high reimbursements for high-wage hospitals make it easy for them to maintain high wages. *See id.* Meanwhile, low reimbursements for low-wage hospitals prevent them from paying higher wages, which keeps them at the low end of the wage index. *See id.*; *see also Bridgeport Hospital*, 589 F. Supp. 3d at 6. HHS calls that a "downward spiral." 84 Fed. Reg. at 19,394.

In response, HHS in 2019 "proposed inflating the wage index value of the hospitals in the lowest quartile." *Bridgeport Hospital*, 589 F. Supp. 3d at 6; *see also* 84 Fed. Reg. at 19,394-96. To be precise, HHS decided to raise each of these low-wage hospitals' "wage index value" by half the difference between (1) their congressionally prescribed value and (2) the value of a hospital at the 25th percentile line for wages. *Bridgeport Hospital*, 589 F. Supp. 3d at 6. So if a hospital had a congressionally prescribed value of 0.5, and if the 25th percentile of all hospitals had a value of 0.8, then HHS would now give that hospital a value of 0.65 instead of 0.5. *See id.*

To balance the budget, HHS also proposed "applying a budget neutrality factor" for all other hospitals. 84 Fed. Reg. at 19,672. So while the lowest quartile of hospitals would be over-paid by $245 million, all other hospitals will be under-paid by $245 million.

Later that year, HHS promulgated a final rule adopting its wage-index adjustment for fiscal years 2020 to at least 2023. *See* Final Rule, 84 Fed. Reg. 42,044, 42,048 (Aug. 16, 2019). A coalition of hospitals administratively challenged the rule. *See Bridgeport Hospital*, 589 F. Supp. 3d at 7. HHS certified the Hospitals to bring their challenge in federal court, which they did. *See* 42 C.F.R. § 405.1842(f); *cf. Allina Health Services v. Price*, 863 F.3d 937, 940 (D.C. Cir. 2017).

The district court held that HHS lacks authority to create its redistribution policy and so granted summary judgment to the Hospitals. *See Bridgeport Hospital*, 589 F. Supp. 3d at 10-15. But rather than vacating HHS's rule, the district court remanded it to HHS with instructions to recalculate the challenged reimbursements. *See Bridgeport Hospital v. Becerra*, 2022 WL 4487114, at *3-4 (D.D.C. July 27, 2022).

HHS appealed the merits. The Hospitals cross-appealed the remedy.[1]

## II. The Statute Does Not Authorize HHS's Wage-Index Redistribution Policy

The Department of Health and Human Services lacks the power to inflate reimbursement rates beyond the

---

[1] Because HHS's appeal of the district court's remand order puts the order properly before us, *see North Carolina Fisheries Association, Inc. v. Gutierrez*, 550 F.3d 16, 19 (D.C. Cir. 2008) ("a limited exception" allows federal agencies to appeal remand orders), "we may also consider the Hospitals' cross-appeal," *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1012 (D.C. Cir. 1999); *see also NAACP v. U.S. Sugar Corp.*, 84 F.3d 1432, 1436 (D.C. Cir. 1996) ("what matters for the purposes of our appellate jurisdiction is whether the district court's decision — and not any particular party challenging it — is properly before us").

congressionally prescribed wage-index values for an entire quartile of hospitals. The wage-index provision does not authorize it. *See* 42 U.S.C. § 1395ww(d)(3)(E)(i). Neither does the adjustments provision. *See id.* § 1395ww(d)(5)(I)(i).

## A. The Wage-Index Provision

The wage-index provision does not authorize HHS to depart from Congress's established formula for a favored quartile of hospitals simply because HHS wants those favored hospitals to be able to pay their employees higher wages in the future.

We begin by examining the text of the wage-index provision:

> [T]he Secretary **shall adjust** the proportion, (as estimated by the Secretary from time to time) of hospitals' costs which are attributable to wages and wage-related costs, of the [diagnosis-related group] prospective payment rates computed under subparagraph (D) for area differences in hospital wage levels **by a factor** (established by the Secretary) reflecting **the** relative hospital wage level in the geographic area of the hospital compared to **the** national average hospital wage level. Not later than October 1, 1990, and October 1, 1993 (and at least every 12 months thereafter), the Secretary shall update the factor under the preceding sentence **on the basis of** a survey conducted by the Secretary (and updated as appropriate) of the wages and wage-related costs of subsection (d) hospitals in the United States.

42 U.S.C. § 1395ww(d)(3)(E)(i) (emphases added).

As we have said before, the wage-index provision "is hardly a paragon of clarity." *Southeast Alabama Medical Center v. Sebelius*, 572 F.3d 912, 915 (D.C. Cir. 2009). Nevertheless, the provision includes four textual clues relevant to our inquiry. Together, they persuade us that the wage-index provision does not authorize HHS's wage-index redistribution policy.

### 1. "shall"

We begin with the unremarkable observation that Congress gave HHS a mandatory duty. It said HHS "shall adjust" wage-based reimbursements. 42 U.S.C. § 1395ww(d)(3)(E)(i). While the word "may" is permissive and signals discretion, the word "shall" generally signals a mandatory duty. *Kingdomware Technologies, Inc. v. United States*, 579 U.S. 162, 171-72 (2016); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 112-13 (2012). And where a statute uses "shall" in some provisions and "may" in others, as § 1395ww does here, Congress likely used "shall" to "impose[] a mandatory duty" that is "impervious to discretion." *Maine Community Health Options v. United States*, 590 U.S. 296, 310-11 (2020) (cleaned up). In other words, HHS does not possess unlimited and directionless discretion.

### 2. "by a factor"

Congress further restrained HHS by specifying that it must make the annual wage-based adjustment "by a factor." 42 U.S.C. § 1395ww(d)(3)(E)(i). Consider that Congress could have told HHS to adjust reimbursements without specifying *how* to calculate the adjustment. Or Congress could have allowed HHS to calculate the adjustment however HHS thought "reasonable and necessary" — a phrase used

elsewhere in this statute. *See id.* § 1395ww(b)(4)(A)(i). Either of those options might well have conferred the broad discretion HHS claims. But instead, Congress authorized HHS to adjust the reimbursement rate only according to a specific, calculated "factor."

### 3. "the"

That factor must "reflect[ ] *the* relative hospital wage level in the geographic area of the hospital compared to *the* national average hospital wage level." *Id.* § 1395ww(d)(3)(E)(i) (emphases added). By using the definite article "the" before "relative hospital wage level" and "national average hospital wage level," Congress specified that each of these metrics has a single, definite, discernable value. *Id.*; *see Nielsen v. Preap*, 586 U.S. 392, 407-08 (2019); *United States v. Little*, 78 F.4th 453, 457 (D.C. Cir. 2023). So the wage-index factor must "reflect" the calculated difference in two objective, discernable numbers.

### 4. "on the basis of"

In addition, the factor must be updated "on the basis of a survey" of each hospital's "wages and wage-related costs." 42 U.S.C. § 1395ww(d)(3)(E)(i). While terms such as "'based on' do not necessarily mean 'rest *solely on*,'" they do prohibit a governmental actor from taking actions that "abandon" or "supplant" the authorized scheme or decisional criteria. *Nuclear Energy Institute, Inc. v. EPA*, 373 F.3d 1251, 1269 (D.C. Cir. 2004) (cleaned up). So the annual adjustment to the wage-index factor must be anchored to the survey of wages, and not to other policy factors that would abandon or supplant the data-driven metric prescribed by Congress.

### 5. Putting the Four Textual Clues Together

Based on those four textual clues, we conclude that the wage-index provision imposes (1) a mandatory duty on HHS to make the annual wage adjustment, (2) based on a uniform factor (3) comprised of definite, objective data, (4) drawn from a survey of each hospital's wages and reflecting the disparities between regional and national wages. And that simply is not what HHS has done here. Its proposed policy distorts the uniform factor, jettisons the definite, objective data, and departs from the actual disparities between regional and national wages. And it does so in spite of a mandatory duty to follow the formula Congress chose.

Of course, HHS has some discretion in how it conducts the survey or compiles the data for calculation. *See Anna Jacques Hospital v. Burwell*, 797 F.3d 1155, 1164-65 (D.C. Cir. 2015). But the wage-index provision requires "that the wage index must be uniformly determined and applied." *Atrium Medical Center v. HHS*, 766 F.3d 560, 569 (6th Cir. 2014). It also must "encompass only wages and wage-related costs and must reasonably reflect the relative hospital wage level in a given area." *Id.* (cleaned up); *see also Anna Jacques Hospital*, 797 F.3d at 1158; *Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 1225, 1230 (D.C. Cir. 1994). Once that uniform calculation of the comparative wage rates has been calculated, nothing in the wage-index provision permits HHS to change those rates simply because it would rather give preferred hospitals more money and disfavored hospitals less.

## B.  The Adjustments Provision

HHS offers a back-up argument.  It points to an adjustments provision that applies to inpatient reimbursements:

> HHS "shall provide by regulation for such other exceptions and **adjustments** to such payment amounts under this subsection as the Secretary deems appropriate."

42 U.S.C. § 1395ww(d)(5)(I)(i) (emphasis added).

To be sure, this adjustments provision does some real work.  It allows HHS to "fill[]" the "space that the specific provisions do not occupy."  *Adirondack Medical Center v. Sebelius*, 740 F.3d 692, 699 (D.C. Cir. 2014) (interpreting "adjustment" in § 1395ww(d)(5)(I)(i)).  So, whereas "all else equal, silence indicates a lack of authority," *Loper Bright Enterprises v. Raimondo*, 45 F.4th 359, 374 (D.C. Cir. 2022) (Walker, J., dissenting), *majority op. rev'd*, 144 S. Ct. 2244, 2273 (2024), the adjustments provision here specifically authorizes regulatory "adjustments."[2]

But the adjustments provision has limits, beginning with the limits of the word "adjustments."  We have said that "similar limits inhere in the term '*adjustments*' to those the Supreme Court found in the word '*modify*.'"  *Amgen, Inc. v.*

---

[2] Section 1395ww(d)(5)(I)(i) contemplates both an "exceptions" authority and an "adjustments" authority.  An exception is a special case that departs from a generally applicable rule.  That, according to HHS, is not this case.  Here, HHS called its redistribution plan an "adjustment" and invoked only its "adjustments" authority.  *See* HHS Br. 14-24; *see also* 84 Fed. Reg. 42,044, 42,048, 42,328 (Aug. 16, 2019).  We therefore analyze the redistribution policy only as an "adjustment."

*Smith*, 357 F.3d 103, 117 (D.C. Cir. 2004) (emphases added); *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2368-69 (2023) ("modify"); *MCI Telecommunications Corp. v. AT&T*, 512 U.S. 218, 225 (1994) ("modify").

Those cases teach that the terms "modify" and "adjust" mean "to change moderately or in minor fashion." *MCI*, 512 U.S. at 225. Each term connotes "increment or limitation." *Id.* So the adjustments provision in § 1395ww(d)(5)(I)(i) is a "subtle device" with "limits," *Nebraska*, 143 S. Ct. at 2368, 2370-71 (cleaned up), that can't be used for a "severe restructuring of the statutory scheme" or a "substantial departure from the default amounts," *Amgen*, 357 F.3d at 117.

HHS's wage-index adjustment exceeds those limits.

To begin with, the wage-index adjustment does not fill a gap left by statutory silence. Far from it. The statute *already* instructs how to account for geographic differences in wages. *See* 42 U.S.C. § 1395ww(d)(3)(E)(i).

Indeed, the Medicare Act prescribes formulas for inpatient reimbursements in excruciating detail. For a flavor of that detail, read the 1,300-word formula for extra inpatient reimbursements to hospitals with "indirect costs of medical education." *Id.* at § 1395ww(d)(5)(B). Or the 500-word formula for extra inpatient reimbursements to "small rural hospital[s]." *Id.* at § 1395ww(d)(5)(G). Or the 1,900-word formula for extra inpatient reimbursements to hospitals with a

"disproportionate number of low-income patients." *Id.* at § 1395ww(d)(5)(F).

We could go on and on, because § 1395ww(d) itself goes on and on.[3] Our point, however, is not nearly as complicated as the statute. It is simply this — in § 1395ww(d), Congress did not paint with broad strokes while delegating all the hard decisions to an agency. Section 1395ww(d) is instead a regime of highly specific formulas. And HHS does not "complement" § 1395ww(d) when it jettisons one of those formulas. *Adirondack*, 740 F.3d at 699. Rather, HHS "supplant[s]" it "with a new regime entirely." *Nebraska*, 143 S. Ct. at 2369.

Furthermore, HHS's use of the adjustments provision "does not remotely resemble" any use of that provision held valid by this or any other court in a case identified by HHS. *Id.* at 2370. To the contrary, HHS has identified no time when it has relied on the adjustments provision to override a statutory command as specific as the congressionally required formula in the wage-index provision. *Cf. Shands Jacksonville Medical Center v. Burwell*, 139 F. Supp. 3d 240, 260 (D.D.C. 2015) (the adjustments "provision does not give the Secretary *carte blanche* to override the rest of the Act").

In addition, the redistribution policy is neither low in cost nor narrow in scope. Rather, it redistributes $245 million in Medicare funding to 25 percent of reimbursed hospitals. And so far as we can tell, the supposed need for a redistribution might continue as long as there are geographical differences in wages — differences that are not going away any time soon. Those three factors — expense, scope, and longevity — add up

---

[3] So does the rest of the section on inpatient reimbursement formulas. At nearly 60,000 words, § 1395ww is longer than many books. *See, e.g.*, F. Scott Fitzgerald, *The Great Gatsby* (1925).

to a "substantial departure from the default amounts" required by the (original) wage-index provision. *Id.*; *see also Nebraska*, 143 S. Ct. at 2368-69.

In HHS's defense of its (unprecedented, expensive, broad, and possibly never-ending) change to congressional policy, HHS says this case is like *Adirondack Medical Center v. Sebelius*, 740 F.3d 692 (D.C. Cir. 2014). There, Congress expressly authorized a specific adjustment for a group of hospitals that operated under what's called the "federal rate" of reimbursements. *Id.* at 694. We held that HHS could give a similar bump in funding to a different group of hospitals, which were classified under the "hospital-specific rate" of reimbursements. *Id.* at 695. That's because HHS could "fill[ ]" the silence in the statute about whether or not to provide an adjustment to the "hospital-specific rate" hospitals. *Id.* at 699. So the congressionally ordered adjustment and the HHS-created adjustment complemented each other, and the latter filled a space that the former did not occupy. *See id.*

Here, in contrast, there is no silence. Instead, Congress created a detailed reimbursement scheme that reflects actual wages in different regions. HHS then swept aside the scheme's congressionally required formula because HHS determined that the scheme should serve a different policy goal altogether — namely, increasing wages at the lowest-wage hospitals. That is not in any sense a reimbursement "adjustment," but an entirely different policy.

*Adirondack* did not uphold that kind of change to an express congressional policy, nor can we do so today.[4] We

---

[4] Also, *Adirondack* "rest[ed] on *Chevron* deference." 740 F.3d at 696. But even before the Supreme Court overruled *Chevron*, *see*

hold instead that the adjustments provision in § 1395ww(d)(5)(I)(i) does not authorize HHS to set aside the congressionally required formula in the wage-index provision, § 1395ww(d)(3)(E)(i). *See Nebraska*, 143 S Ct. at 2368-71; *see also American Hospital Association v. Becerra*, 596 U.S. 724, 737 (2022) (rejecting HHS's expansive interpretation of its "adjustment authority" because that "interpretation . . . would eviscerate such significant aspects of the statutory text").

## III.  The Rule Should Be Vacated

When an agency's action is unlawful, "vacatur is the normal remedy." *Allina Health Services v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).  That's because Congress directed us to "hold unlawful and set aside agency action" that is "not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  "[T]o 'set aside' a rule is to vacate it."  *Corner Post, Inc. v. Board of Governors*, No. 22-1008, slip op. at 6 (2024) (Kavanaugh, J. concurring); *see also id.* at 5 ("The APA prescribes the same 'set aside' remedy for all categories of 'agency action' . . . .").

Nevertheless, our court has sometimes remanded without vacating the agency's action.  That is an "exceptional remedy." *American Great Lakes Ports Association v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020).  And our precedents allow it only if an agency's error is "curable."  *U.S. Sugar Corp. v. EPA*, 844

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024), *Chevron* would not have applied to this case.  Here, HHS has neither sought *Chevron* deference nor identified any ambiguity that it used the adjustments provision to fill.  *Shands Jacksonville Medical Center v. Burwell* — a district court precedent cited by HHS — is distinguishable for the same reason. *See* 139 F. Supp. 3d 240, 251 (D.D.C. 2015) (proceeding under "the two-step framework set forth in" *Chevron*).

F.3d 268, 270 (D.C. Cir. 2016); *see also Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 151 (D.C. Cir. 1993) (allowing the remedy when "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand").[5]

Because an agency can't "cure" the fact that it lacks authority to take a certain action, remand-without-vacatur is unavailable here. HHS was powerless to adopt this wage-index adjustment, which means HHS will not be able to justify its decision on other grounds. Therefore, the district court should have vacated the rule rather than ordering remand without vacatur.[6]

## IV. The Hospitals Should Receive an Award of Interest

The Medicare statute provides that when hospitals seek judicial review of HHS's decisions, "the amount in controversy shall be subject to annual interest," which is then "to be

---

[5] The conflict between 5 U.S.C. § 706(2)(A)'s command and our creation of remand without vacatur has been noted in more than one separate opinion. *See Checkosky v. SEC*, 23 F.3d 452, 491 (D.C. Cir. 1994) (Randolph, J., separate opinion) ("Setting aside means vacating; no other meaning is apparent."); *see also Comcast Corp. v. FCC*, 579 F.3d 1, 10-12 (D.C. Cir. 2009) (Randolph, J., concurring); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 757-58 (D.C. Cir. 2002) (Sentelle, J., dissenting).

[6] The Hospitals took a confusing tack when arguing vacatur before the district court. They sought vacatur of the budget-neutrality adjustment (which reduced their respective reimbursements) without seeking vacatur of the wage-index adjustment. *See Bridgeport Hospital v. Becerra*, 2022 WL 4487114, at *3 (D.D.C. July 27, 2022). But because the budget-neutrality adjustment existed only as a subsidiary component of the wage-index redistribution policy, the two adjustments are inextricably intertwined.

awarded by the reviewing court in favor of the prevailing party." 42 U.S.C. § 1395*oo*(f)(2). The Hospitals claim that the district court should have ordered an award of interest because they were the prevailing parties below.

For its part, HHS does not dispute that the Hospitals were the "prevailing parties." Instead, it argues that an award of interest is premature until the precise back-payments have been calculated.

Because the Medicare statute requires a "reviewing court" (not the agency) to "award[]" interest, we agree with the Hospitals. *Id.* § 1395*oo*(f)(2); *see also Tucson Medical Center v. Sullivan*, 947 F.2d 971, 980-83 (D.C. Cir. 1991). It does not matter whether back-payments have been calculated. The statute requires a judicial order directing the future award of interest whenever such calculations have been finalized. So on remand, the district court should add an award of interest to its order.[7]

## V. Conclusion

Because HHS cannot manipulate wage-index rates up and down in a way that picks winners and losers by sweeping aside the congressionally required formula, HHS's wage-index redistribution policy is unlawful. And because the unlawful policy is not curable on remand, HHS's action must be vacated.

---

[7] The order need not calculate the exact interest. It is enough to simply state that on the remand to HHS, HHS must pay the prevailing parties interest on increased reimbursements in accordance with 42 U.S.C. § 1395*oo*(f)(2). *See, e.g.*, *Alegent Health-Immanuel Medical Center v. Sebelius*, 917 F. Supp. 2d 1, 3-4 (D.D.C. 2012).

We therefore affirm in part, reverse in part, and remand to the district court for further proceedings consistent with this opinion.

*So ordered.*